**Affirmed and Memorandum Opinion filed June 29, 2023**



In The

# 𝔉ourteenth 𝔗ourt of 𝔄ppeals

### NO. 14-23-00018-CV

## IN THE INTEREST OF J.H., J.H., AND J.H., CHILDREN

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 111533-F**

## MEMORANDUM OPINION

C.B. (Mother) appeals the trial court's final order in a suit affecting the parent-child relationship in which she was appointed possessory conservator of her children, J.H. (John), J.H. (James), and J.H. (Jacob).[1] On appeal, Mother challenges the legal and factual sufficiency of the evidence to support the appointment of the Department of Family and Protective Services (the Department) as permanent managing conservator.[2] We affirm.

---

[1] We use pseudonyms to refer to appellant's children in this case. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] The father of James and Jacob are unknown. J.H. was named as the possessory

## *Background*

The Department received a referral alleging neglectful supervision of John and James. An investigator testified that the referral began when Mother attempted suicide by filling a bathtub with water and submerging herself under water until she blacked out. Mother was 36-weeks pregnant with her sixth child, Jacob, and she was the only one in the home caring for John, who was six years old, and James, who was two years old.[3] After John and James were able to wake Mother up, she took them to a family member and checked herself into the University of Texas Medical Branch for treatment.

The Department investigated the neglectful supervision allegation. The investigator testified that she contacted the hospital case manager and confirmed that Mother's treatment plan was to remain at the hospital for three days to complete a psychiatric evaluation. One day after the investigation began, the hospital case manager notified the investigator that Mother left the hospital against medical advice. That same day, the investigator contacted Mother regarding her attempted suicide. Mother denied that she attempted to commit suicide. Mother explained that she was having a "bad day" and "had not been on her medications for [two] days." Mother admitted to discharging herself against medical advice and testified that she had an active warrant for driving without a license and a prior harassment conviction. Following the investigation, John and James were removed from Mother's care and

---

conservator of John, but he did not appeal the Department's appointment as permanent managing conservator.

[3] At the time Mother attempted suicide, she had five children: Jane, Sarah, Marie, John, and James. Mother's three oldest children were no longer in her care. Jane was in foster care, Sarah was adopted, and Marie was temporarily living with a family member. Mother's three oldest children are not subjects of this appeal and are only referenced for background purposes. Hereinafter, when the term "children" is used, the term is referring to the three children who are subjects of this appeal, John, James, and Jacob.

placed in foster care. After Jacob was born, he was also removed and placed in foster care.

The Department filed a lawsuit for protection and requested to be appointed as temporary sole managing conservator of the children. The Department further requested that, if reunification with Mother could not be achieved, the Department be appointed as permanent sole managing conservator of the children or that Mother's rights be terminated under chapter 161.

Prior to trial, Mother participated in services provided by the Department. Eventually, the children were returned to her care, but the Department remained temporary conservator of the children. The children remained in Mother's care for twelve months. During this period, no problems were reported.

The Department intended to dismiss the case until the investigator learned of a disturbance between Mother and her sister, D.R., on the eve of trial. Mother and D.R. had a verbal altercation, and D.R. asked Mother to leave. Mother refused, and the argument continued. In the midst of the argument, Mother instructed John, who was seven years old, to retrieve her handgun from her vehicle. John complied with Mother's instructions, went outside unsupervised, retrieved the handgun, and gave it to Mother.

Law enforcement responded to the disturbance. One of the responding officers testified that he was dispatched to D.R.'s home because of a disturbance. When he arrived, he spoke with D.R. and then Mother. D.R. told the officer that she saw John holding a handgun. Mother admitted to the officer that she told John to go out to the vehicle and retrieve her handgun. According to Mother, John was trained on gun safety by his father. The officer testified that he recovered the handgun in an unsecured dresser in the bedroom. The officer described the handgun as a semi-automatic and stated that the handgun had eleven bullets in the magazine. He

testified that there was not a round in the chamber and that Mother surrendered the handgun. Charges were filed against Mother for child endangerment.

The officer testified that as he was leaving the scene, Mother exited the home and yelled threats directed at D.R. Mother threatened to "beat [D.R.]" and "knock her out." D.R. wanted to remove Mother and her children from the home, and the officer told D.R. that it was a civil matter that required a formal eviction. The officer left the scene and did not force Mother and her children to leave. Later that day, Mother elected to voluntarily leave the home. While Mother was packing her belongings to leave, the argument between her and D.R. resumed. Law enforcement was called out again to standby while Mother gathered the rest of her belongings. Mother and her children left to stay at a motel, and the children were eventually returned to foster care.

Mother testified about the events leading up to the handgun incident. She explained that D.R. was slamming doors and yelling at Mother and the children about cleaning up. Mother stated that she did not want to deal with D.R. yelling, so she began packing to leave. She asserted that she instructed John to get her handgun from the car because she wanted to put it in the lockbox. Mother testified that the magazine to the handgun was in the top drawer of the bedroom dresser. She wanted to secure the handgun and the magazine in the lockbox prior to leaving the house. She testified that her handgun was always in a lockbox or the car locked away from the children.

When John retrieved the handgun, she admitted that she did not supervise him, but she testified that the handgun was unloaded, and the magazine was in the top drawer of the bedroom dresser. Mother explained that by the time she surrendered the handgun to law enforcement, the magazine was in the handgun, and there were six bullets in the handgun. Mother was adamant that the magazine was not in the

4

handgun at the time that John handled it. She stated that she taught John gun safety and instructed him to only put his finger on the trigger when it was an "emergency." On cross-examination, Mother clarified that she was referring to A.H. as John's "father."[4] Mother acknowledged that she made a mistake in letting John handle the gun but believed that she was a good mother to her children.

At the conclusion of the trial, the trial court expressed concerns about Mother's credibility. Nonetheless, the trial court acknowledged that there was not clear and convincing evidence that the specific incident involving the handgun endangered John's physical or emotional well-being because there was no evidence refuting Mother's assertion that the handgun was unloaded at the time John handled it. Notably, the Department conceded that there was no evidence the handgun was actually loaded. The trial court concluded that there was insufficient evidence and denied the Department's request to terminate Mother's parental rights but found that Mother engaged in conduct described in subsection (E) of section 161(b)(1) of the Family Code.

On January 6, 2023, the trial court signed its final order, finding that appointment of Mother as managing conservator would not be in the children's best interest. The trial court appointed the Department as permanent managing conservator of the three children and maintained their current placements. The trial court appointed Mother as possessory conservator, enjoined her from possessing a firearm while in the presence of the children, and ordered her to participate in services provided by the Department.

### *Discussion*

---

[4] The appellate record reflects that Mother was previously in a romantic relationship with A.H. A.H. was a parental-figure to the children, and each child carried A.H.'s surname.

In her sole issue on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the appointment of the Department as permanent sole managing conservator of the children. Mother contends that there was no evidence that her appointment as managing conservator would significantly impair the children's physical health or emotional development. The Department argues that the trial court did not abuse its discretion because Mother's appointment as managing conservator would not be in the children's best interest. We agree with the Department.

We review managing conservatorship orders for abuse of discretion. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see also In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). A court abuses its discretion when it acts unreasonably, arbitrarily, or without reference to guiding principles. *In re R.T.K.*, 324 S.W.3d at 899; *see also Swaab v. Swaab*, 282 S.W.3d 519, 529 (Tex. App.—Houston [14th Dist.], 2008, pet dism'd w.o.j.). In this context, legal and factual sufficiency challenges are not independent grounds of error; instead, they are factors to be considered in determining whether the trial court abused its discretion. *See In re Marriage of Butts*, 444 S.W.3d 147, 153 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Baltzer v. Medina*, 240 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis, asking: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *Swaab*, 282 S.W.3d at 525. A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. *R.T.K.*, 324 S.W.3d at 900; *Baltzer*, 240 S.W.3d at 475.

Although trial courts are afforded broad discretion in deciding family law questions, the legislature has explicitly limited the exercise of that discretion when a nonparent seeks to be appointed as managing conservator. *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990). When a court determines conservatorship between a parent and a nonparent, a presumption exists that appointing the parent as the sole managing conservator is in the children's best interest; this presumption is deeply embedded in Texas law. *See* Tex. Fam. Code § 153.131. A parent shall be named the children's managing conservator unless the court finds, as the court did here, that such appointment would significantly impair the children's physical health or emotional development. *See id.*

Section 263.404 of the Family Code authorizes the trial court to appoint the Department as managing conservator of children without terminating the rights of the parent when the trial court finds that "appointment of a parent as managing conservator would not be in the best interest of the child[ren] because the appointment would significantly impair the child[ren]'s physical health or emotional development" and that "it would not be in the best interest of the child[ren] to appoint a relative of the child[ren] or another person as managing conservator." *Id.* § 263.404(a). Among the factors that courts shall consider in making this determination are "the needs and desires" of the children and "the willingness and ability of the child[ren]'s family to effect positive environmental and personal change . . . ." *Id.* § 263.404(b); *see also id.* § 263.307 (stating that "prompt and permanent placement of the child[ren] in a safe environment is presumed to be in the child[ren]'s best interest" and listing factors that the court should consider "in determining whether the child[ren]'s parents are willing and able to provide the child[ren] with a safe environment"); *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (describing factors that courts may consider in determining best interest of the

children).

To support a finding that appointment of a parent as sole managing conservator would significantly impair the children's physical health or emotional development, the evidence must do more than "merely raise a suspicion or speculation of possible harm." *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm."). Generally, the nonparent seeking conservatorship must instead "offer evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child[ren]." *Lewelling*, 796 S.W.2d at 167. Such evidence usually includes a showing of "physical abuse, severe neglect, abandonment, drug or alcohol abuse, or very immoral behavior on the part of the parent." *In re F.E.N.*, 542 S.W.3d 752, 770 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (quoting *In re R.L.*, Nos. 01-16-00851-CV, 01-16-00852-CV, 01-16-00875-CV, 2017 WL 1496955, at *15 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (mem. op.).

In the case before us, the trial court heard testimony of multiple different incidents that indicated that Mother's appointment as managing conservator would significantly impair the physical health or emotional development of the children. The trial court heard testimony of Mother's past history of child neglect, poor decision-making, and Mother's inability to maintain a stable home for her children. Mother testified that she had six children. There was not a single time that all of her children lived in the same home at the same time. All of Mother's children had been involved with the Department at some point, and Mother's three oldest children were removed from her care by the time that they were one year old. The trial court heard

8

testimony that Jane had been in the Department's care for over twelve years. During that twelve year period, the Department attempted to work with Mother, but Mother never completed the required services to regain custody. Mother testified that she gave her cousin temporary custody of Marie over nine years ago and did not have any meaningful involvement in Marie's life besides occasional phone calls. Mother acknowledged that Jacob was entering the foster care system at a similar age as her three oldest children. The trial court also heard testimony that Mother was evicted multiple times for failing to comply with her lease agreement and moved five times within the span of less than two years. Additionally, Mother admitted that she had an active warrant for driving without a license, yet she continued to drive her children in her vehicle.

The trial court could have considered this conduct in determining that Mother's appointment as managing conservator would significantly impair the physical health or emotional development of the children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("[C]onduct that subjects a child to a life of uncertainty and instability, endangers the physical and emotional well-being of a child.").

The trial court also heard testimony that Mother attempted to commit suicide by filling a bathtub with water and submerging herself. At the time that Mother attempted suicide, she was 36-weeks pregnant with Jacob, and she was the only one in the home caring for John and James, who were both under seven years old. According to the investigator, Mother told her that she had not been on her medication for two days prior to the most recent suicide attempt. Moreover, the testimony revealed that Mother had a "history of thoughts of self-harm," and the last episode was about six months before her pregnancy. Mother testified that she has been diagnosed with ADHD, bipolar disorder, depression, and anxiety, and she was

9

taking medication to manage her mental disorders. Because Mother's mental state allowed her to engage in conduct that jeopardized the physical or emotional well-being of her children, the trial court was permitted to consider her mental state in determining whether she endangered her children. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

The trial court also heard testimony that Mother engaged in a verbal altercation with her sister that necessitated law enforcement intervention on the eve of having her case dismissed. Testimony revealed, and Mother admitted, that at some point during the argument, Mother's sister asked Mother to leave her home, and Mother refused. Subsequently, Mother told her seven-year-old child to retrieve her semi-automatic handgun from her vehicle. Mother admitted that John went outside unsupervised. There was no testimony contravening Mother's testimony that the handgun was unloaded at the time John handled it. However, the trial court determined that Mother's credibility was questionable. The officer responding to the disturbance between Mother and her sister testified that Mother threatened to beat up her sister and "knock her out" in his presence. The officer also testified that charges were filed against Mother for child endangerment.

We conclude that there is some evidence of a substantive and probative character to support the trial court's decision. Viewing all the evidence in a light most favorable to the trial court's decision, we cannot say that the trial court's judgment was arbitrary or unreasonable. It was entirely within the trial court's discretion to determine that Mother was not willing to provide an environment conducive to her children's physical health and emotional development and that appointment of the Department as sole managing conservator was in the children's best interest.

Accordingly, we hold that the trial court did not abuse its discretion in

appointing the Department as the sole managing conservator of John, James, and Jacob. We overrule Mother's sole issue.

## *Conclusion*

We affirm the judgment of the trial court.


/s/    Frances Bourliot
Justice


Panel consists of Justices Wise, Bourliot, and Spain.